determine when shares were purchased. Shares purchased prior to February 10, 2003 will not be subject to the redemption fee. **The redemption fee will be deducted from your redemption proceeds and retained by the Fund to help cover transaction and tax costs that long-term investors may bear when the Fund realizes capital gains as a result of selling securities to meet investor redemptions.** The redemption fee is not imposed on redemptions or shares purchased through reinvestment of dividends and distributions, or exchanges of shares for Class Z shares of a fund distributed by Liberty Funds Distributor, Inc. that has a redemption fee. The Fund may waive the 2% redemption fee for 401(k) plans that are in the process of liquidating their Fund investments.

(emphasis added).

76.    Contrary to these stated policies, the Columbia Defendants knowingly permitted and actively facilitated the Timer Defendants' market timing to the detriment of the Columbia Funds and their shareholders.

77.    The Timer Defendants perpetrated this manipulative scheme on the Columbia Funds, from at least 1998 to 2003, directly or with the complicity of the Columbia Defendants. The schemes violated the said defendants' fiduciary duties to the Columbia Funds and their shareholders, but resulted in illicit gains to the defendants in the form of substantial fees and other income for themselves and their affiliates.

78.    On January 15, 2004 FleetBoston, the ultimate parent of Fleet National Bank, the direct parent of Defendant CMG, issued a press release reporting that defendant CMG and Columbia Distributor, Inc. had received "Wells" notices from the Securities and Exchange Commission ("SEC") indicating that the SEC intended to commence an enforcement action relating to improper market timing in Columbia Funds. The press release stated, in relevant part:

In a separate development, FleetBoston said that earlier this month two of its subsidiaries, **Columbia Management Advisors, Inc., and Columbia Funds Distributor, Inc., received "Wells" notices stating that the SEC Regional Office staff in Boston had made a preliminary determination to recommend that enforcement action be brought against them, alleging that certain fund prospectuses did not accurately disclose, in violation of fiduciary duties, certain trading activity in fund shares. We believe that the allegations relate to a limited number of trading arrangements**

**occurring in the period 1998-2003.** The majority of trades made pursuant to these arrangements were made by three entities and occurred in one international and two domestic funds. None of these arrangements is in existence today. The subsidiaries intend to engage in discussions with the SEC in an effort to reach a satisfactory resolution of these matters.

(emphasis added).

79.     On February 24, 2004, the SEC brought an enforcement action against Columbia Distributor and Columbia Advisors alleging the market-timing conduct described herein. That same day, the New York Attorney General initiated a similar action alleging similar conduct. Each of the regulators generally alleged that Columbia Advisors and Columbia Distributor allowed certain preferred mutual fund customers to engage in short-term and excessive trading, while at the same time representing publicly that it prohibited such trading.

80.     On March 15, 2004 the SEC announced that Columbia Advisors and Columbia Distributor had agreed to settle the civil fraud charges filed in connection to the market timing scheme alleged herein. As part of the settlement, the settling defendants agreed to disgorge $70 million in profit, pay $70 million in civil penalties, reduce management fees by $80 million over a period of five years, and implement unspecified changes in fund governance.

## AGREEMENTS WITH MARKET-TIMERS

81.     Beginning in 1998 and continuing through 2003, Columbia Distributor entered into at least nine arrangements with investment advisors, hedge funds, brokers and individuals allowing them to market-time various Columbia Funds in exchange for "sticky asset" investments in other investment vehicles of Columbia affiliates.

**Ilytat, L.P.**

82.     Between April 2000 and October 2002, Defendant Ilytat made nearly 350 round trip trades in seven International Columbia Funds. A significant number of these trades were

made pursuant to an agreement Ilytat made with Columbia Distributor, with the approval of Columbia Advisors and the portfolio manager of the Columbia Newport Tiger Fund (the "Newport Tiger Fund"), to market time the Newport Tiger Fund.

83.    Under the agreement, Ilytat agreed to place $20 million in the Newport Tiger Fund, with two-thirds of that amount remaining static and one third to be actively traded in and out.

84.    In 2000, Ilytat made $133 million in purchases or exchanges and redeemed $104 million in the Newport Tiger Fund. During the first 5 months of 2001, Ilytat's purchases in the Newport Tiger Fund accounted for $72 million of the total purchases of $204 million in that fund.

85.    Columbia Distributor Defendant John Doe 2 (President of Columbia Distributor) knew about Ilytat's market timing in the Newport Tiger Fund, but allowed it to continue. The Portfolio Manager for the Newport Tiger Fund repeatedly wrote to John Doe 2 expressing concern about the harm that Ilytat's activity was having on the fund and its investors. Despite the manager's efforts, by June 2000, Ilytat was making weekly round trips of $7 million.

86.    Ilytat made 73 round trips in the Columbia Acorn International Fund between September 1998 and October 2003. At the peak of its market timing in the Acorn International Funds, Ilytat made at least 40 round trips in the fund.

**Ritchie Capital Management, Inc.**

87.    Between January 2000 and September 2002 Defendant Ritchie made over 250 round trips in the Newport Tiger Fund.

88.    In 2001, Columbia Distributor negotiated with Ritchie to allow 12 round trips in the Newport Tiger Fund. At the end of 2001, Defendant John Doe 1, the Senior Vice President of

Columbia Distributor, met with and sought from Ritchie's principals a "sticky asset" investment in a fixed income fund in exchange for continued timing of the Newport Tiger Fund. At the time, Ritchie's $52 million investment in the Newport Tiger Fund constituted nearly 10% of that fund's $525 million in assets.

89.     In 2002, Columbia Distributor, with the assistance and consent of the Portfolio Manager for the Columbia Growth Stock Fund, agreed to permit Ritchie to market-time 10% of a $200 million investment in that fund with no limit on the number of round trips. Ritchie made at least five round trips within two months in amounts up to $7 million.

90.     In 2003, Ritchie made another agreement, with the permission of both Defendant John Doe 1, the Senior Vice President of Columbia Distributor, and the Portfolio Manager of the Growth Stock Fund, in which he would place $20 million in the Growth Stock Fund, make unlimited round trips with up to $2 million, and place another $10 million in the Columbia Short Term Bond Fund as a sticky asset.

91.     Between June 2002 and Septmeber 2003, Ritchie made approximately 18 round trips in the Growth Stock Fund.

## Edward J. Stern

92.     During late 2002 and early 2003, Defendant Stern negotiated with Columbia Distributor through two intermediaries to market time the Columbia Growth & Income Fund, Columbia Select value Fund, and the Growth Stock Fund. In early 2003, Epic Advisors, on behalf of Stern's firm, CIM, entered an agreement with Columbia Distributor, with the approval of Defendant John Doe 3, Columbia Distributor's National Sales Manager, permitting Stern to make up to 3 round trips per month using his entire investment of $37 million in those three funds.

93.    During the same time period, Stern also placed $5 million in the Columbia High Yield Fund with permission to make one round trip per month from Columbia Distributor and with the approval of the Portfolio Manager for that fund. Between November 2002 and July 2003 Stern made seven round trips in that fund averaging $2.5 million each time.

## Daniel Calugar

94.    Beginning about April 1999, Defendant Calugar reached an agreement with Columbia Distributor allowing him to make one round trip per month using up to $50 million in either the Growth Stock Fund or the Columbia Young Investor Fund, which was a fund targeting children with a goal toward educating young investors. Defendants Joe Doe 4 (the Managing Director of National Accounts for Columbia Distributor), and John Doe 1 (Senior Vice President of Columbia Distributor), as well as the Portfolio Manager for the Growth Stock Fund, approved the arrangement.

95.    In fact, Calugar averaged more than one round trip per day in the Columbia Funds. Calugar made over 200 round trips in the Young Investor Fund in 2000 trading up to $2.3 million at a time. He also made at least 13 round trips in the Stein Roe International Fund.

96.    Calugar made nearly 70 round trips in the Growth Stock Fund of up to $4 million at a time between January 2000 and February 2001. He also made approximately 20 round trips in the Newport International Equity Fund during 2000 in amounts up to $6.6 million.

## Sal Giacalone

97.    Defendant Giacalone entered an agreement with Columbia Distributor, with the approval of its President, Defendant John Doe 2, to place $5 million in sticky assets in the Columbia Acorn Funds in exchange for the right to make up to four round trips per month up to $15 million each in the Newport Tiger Fund.

98.    Giacalone made 43 round trips in the Newport Tiger Fund between November 2000 and April 2001.

**D.R. Loeser**

99.    Defendant Loeser entered an agreement with Columbia Distributor, which was approved by Defendant John Doe 1 (Columbia Distributor's Senior Vice President), the Portfolio Manager of the Growth Stock Fund, and the President of the Stein-Roe fund complex, allowing Loeser to make five $8 million round trips per month in the Growth Stock Fund.

100.    Between January and May 2000 Loeser made approximately 20 round trips in the Growth Stock Fund and 20 round trips in the Young Investor Fund.

**Signalert Corporation**

101.    Defendant Signalert entered an agreement with Columbia Distributor in 1999 that allowed Singalert to make 10 round trips annually up to $7.5 million in both the Growth Stock Fund and the Young Investor Fund. In exchange, Signalert was to place $5 million in each of six other funds trading only once a quarter.

102.    In late 1999, senior management of Columbia Distributor pushed to increase the size of Signalert's investments. Signalert agreed to place additional sticky assets in a money market fund in exchange for permission to make 12 round trips per year year in the Growth Stock Fund and Young Investor Fund. The Growth Stock Fund Portfolio Manager and the Young Investor Portfolio Manager both approved the agreement.

103.    Between 2000 and 2001, Signalert made more than 50 round trips in the Growth Stock Fund and more than 50 round trips in the Young Investor Fund. Between February and August 2001, Signalert made 20 rounds trips in the Young Investor Fund. Between February and December 2001 Signalert made 20 round trips in the Growth Stock Fund.

104.    Signalert also market-timed the Acorn Fund, Galaxy Equity Value Fund, Galaxy Growth & Income Fund, and Stein-Roe Income Fund, making at least 15 round trips in the Acorn Fund between March 2001 and February 2003, 8 round trips in the Stein Roe Income Fund in November 2001, 23 round trips in the Galaxy Equity Fund, and 25 round trips in the Galaxy Growth & Income Fund between February 2001 and January 2002.

**Alan Waldbaum**

105.    Defendant Waldbaum entered into an agreement with Columbia Distributor under which he was permitted to make 10 round trips per year in the Columbia Tax Exempt Fund, a municipal bond fund, if he moved less than $5 million at a time and always kept at least $2 million in the fund. The Portfolio Manager for the fund approved the agreement.

106.    Waldbaum made 10 round trips between November 2002 and October 2003.

**Tandem Financial Services, Inc.**

107.    Defendant Tandem entered an agreement with Columbia Distributor, with the approval of Defendant John Doe 1 (Columbia Distributor's Senior Vice President), permitting Tandem to make an unlimited number of trades in one or more of the Columbia Funds.

108.    Tandem made over 100 round trips in the Columbia Tax Exempt Fund between February 2000 and September 2003.

## COLUMBIA DISTRIBUTOR ACTIVELY OBSTRUCTED
## EFFORTS TO PREVENT TIMING

109.    Columbia Distributor's executives and employees prevented others from interfering with the Timer Defendants' market timing activities:

a)    In March 2001, John Doe 1, Columbia Distributor's Senior Vice President, caused a Columbia Services manager responsible for market timing to

telephone a portfolio assistant for the Acorn International Fund and tell her that it was "inappropriate" for her to take any direct action to stop Ilytat from market timing.

b)    Columbia Services then put Ilytat on a list of "Authorized Accounts for Frequent Trading" against which no action was to be taken.

c)    Defendant John Doe 1 also intervened when the Portfolio Manager for the Acorn International Fund complained about and tried to stop Ilytat's market timing.

d)    In 2002, Defendant John Doe 4, Columbia Distributor's Managing Director for National Accounts, intervened to reverse a stop placed Ilytat's trading by Columbia Services.

e)    In 2003, a Columbia Distributor's sales manager intervened when Columbia Services tried to stop Tandem from market-timing the Tax Exempt Fund. Tandem was allowed to continue timing through October 2003.

## COLUMBIA DISTRIBUTOR, WAM, AND COLUMBIA ADVISOR DIRECTLY BENEFITTED FROM MARKET-TIMING

110.    Because WAM and Columbia Advisor receive advisory fees based on total assets under management in the Columbia Acorn Funds and the Non-Acorn Columbia Funds, respectively, it served their interests to obtain the largest possible investment in a fund. Therefore, both WAM and Columbia Advisor benefited directly from the market-timing agreements with the Timer Defendants.

111.    Columbia Distributor received revenue and its executives were compensated based on the total amount of assets they caused to be invested in the funds. As a result, Columbia Distributors directly benefited from placing timer money in the funds.

112.  CMG, by virtue of its position as controlling parent of the Advisor Defendants, Columbia Distributor, and Columbia Services, is responsible for and has power to supervise those entities.

113.  Fleet Bank by virtue of its position as controlling parent of CMG is responsible for and has power to supervise CMG, the Advisor Defendants, Columbia Distributor, and Columbia Services.

114.  FleetBoston, by virtue of its position as the ultimate parent of the Columbia Defendants, has ultimate responsibility and power to supervise the Columbia Defendants.

115.  The events described in this Complaint have had and will have a series of deleterious effects on the Columbia Funds, including but not limited to:

(a)    The Columbia Funds incurred extensive and unnecessary transactional costs due to the market-timing transactions executed as part of the scheme alleged herein;

(b)    The Columbia Funds' net returns were reduced as a result of the excessive reserve funds set aside to fund redemptions by investors who were permitted to time the funds;

(c)    The Columbia Funds' net returns were reduced as a result of the difficulties associated with the management of a market timed fund caused by significant short term inflows and outflows that are associated with market timing activity. Market timing significantly interferes with the ability of advisors to manage a fund the way it would be without market timing activity;

(d)    The Columbia Funds' advisory fees reflected additional compensation to advisors and portfolio managers who were compensated for the additional risks and complications inherent in advising and managing market timed mutual funds;

*29*

(e)     The Columbia Funds' returns may have been reduced by the Columbia Defendants' disclosing to the Timer Defendants the trading activity and portfolio position of the timed funds so that, in essence, they could either short the fund or front run the fund;

(f)     Loss of confidence of the investing public in the integrity and management of the Columbia Funds, resulting in outflow from the Columbia Funds causing the Columbia Funds' NAV to decline and the market value of the Columbia Funds to decline.

(g)     As a result of Defendants' misconduct, the Columbia Funds are exposed to significant regulatory scrutiny and to suit by investors for losses, at a minimum, causing the Columbia Funds to incur unnecessary direct and indirect investigatory, litigation and administrative costs, and potentially resulting in awards, judgments or settlements against the Columbia Funds.

## DEMAND EXCUSED ALLEGATIONS

116.    The Plaintiff has not made demand upon the Trustee Defendants to bring an action against the Defendants, and other culpable parties to remedy such wrongdoing alleged in this Complaint because:

(a)     Demand is excused because no such demand is required for the Plaintiff to assert a federal claim under Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), for breach of fiduciary duty in connection with the compensation and other payments paid to the Defendants.

(b)     Demand is also excused because the unlawful acts and practices alleged herein are not subject to the protection of any business judgment rule and could not be

ratified, approved, or condoned by disinterested and informed trustees under any circumstances.

(c)     Demand is also excused because the unlawful acts and practices alleged herein involve self-dealing on the part of the Defendants, who manage and control the day-to-day affairs of the Columbia Funds.

(d)     Demand upon the Trustee Defendants, is also excused because the Trustee Defendants were retained by management of CMG, and thus owe their positions as well as their loyalties to them and lack sufficient independence to exercise business judgment.

(e)     Demand upon the Trustee Defendants is excused because the Trustee Defendants are subject to liability for breaching their fiduciary duties to the Columbia Funds by, *inter alia*, failing to adequately monitor the activity in the Columbia Funds, failing to adequately supervise the Advisor Defendants and failing to prevent and/or halt the timing of the Columbia Funds. As a result, if the Trustee Defendants sued the Advisor Defendants, the Advisor Defendants would have a valid third party claim against the Trustee Defendants, which is a disincentive for the Trustee Defendants to cause the Columbia Funds to prosecute claims against the Advisor Defendants.

(f)     Finally, demand is excused because such demand would be futile. The unlawful acts and practices alleged herein have been the subject of an intense investigation by the Securities and Exchange Commission and New York Attorney General Eliot Spitzer culminating in a two civil complaints filed February 24, 2004. Consequently, the Trustee Defendants and each of them already have been fully informed of the wrongdoing alleged herein and have failed and refused to take appropriate action to recover damages for the Columbia Funds. No shareholder demand could or would

prompt the Trustee Defendants to take action if the SEC's and Attorney General Spitzer's

investigations and complaints did not.

## COUNT I

## VIOLATION OF SECTION 36(a) OF THE INVESTMENT COMPANY ACT
### (Against the Columbia Defendants (other than Columbia Services), the Columbia Distributor Defendants, the Advisor Defendants and the Trustee Defendants)

117.    Plaintiff incorporates by reference all paragraphs above.

118.    The Columbia Acorn Trust, each of the Columbia Funds Trusts and each of the

Independent Columbia Stock Funds are registered investment companies.

119.    The Advisor Defendants are investment advisors under Section 36(a) as that term

is defined in Section 2 of the ICA.

120.    The Columbia Distributor Defendants (including John Does 1-4) act as the

principal underwriter for the Columbia Funds under Section 36(a) as defined in Section 2 of the

ICA.

121.    The Trustee Defendants are directors under Section 36(a) as that term is defined

in Section 2 of the ICA.

122.    FleetBoston, Fleet Bank, and CMG, by virtue of their ownership and position and

responsibilities for managing and directing the activities of Columbia Distributor, the Advisor

Defendants, and John Does 1-4, are liable for the actions of those entities.

123.    Pursuant to Section 36(a) of the ICA, 15 U.S.C. §80a-35(a), the Columbia

Distributor Defendants, the Advisor Defendants and the Trustee Defendants owe to the

Columbia Funds and their shareholders the fiduciary duties of loyalty, candor and due care,

including the duty of advisors to seek approval of any advisory agreement will full disclosure of

information material to the board's decision regarding their compensation and the duty of the

directors to request and evaluate information as may reasonably be necessary to evaluate advisory agreements.

124. Each of the Columbia Distributor Defendants, the Advisor Defendants and the Trustee Defendants breached his/her or its fiduciary duty to the Columbia Funds and their shareholders by the acts alleged in this Complaint.

125. By agreeing and/or conspiring with the Timer Defendants to permit and/or encourage the Timer Defendants to time the Columbia Funds, the Columbia Distributor Defendants and the Advisor Defendants placed their own self-interest in maximizing their compensation and other payments over the interests of the Columbia Funds and their shareholders.

126. After a reasonable opportunity to conduct discovery, plaintiffs believe that the evidence will show that the Columbia Distributor Defendants and the Advisor Defendants did not make full and fair disclosure of all information that would be material to a board's decision regarding advisory and/or other compensation under advisory and/or other agreements.

127. After a reasonable opportunity to conduct discovery, plaintiffs believe that the evidence will show that the Trustee Defendants did not request and/or evaluate information as reasonably may be necessary to evaluate advisory and/or other agreements.

128. As a direct and proximate result of the wrongful conduct alleged above, the Funds and their shareholders were damaged, including by the diminution of assets and value (including the NAV) of the Columbia Funds and corporate waste, for which defendants are liable.

## COUNT II

### VIOLATION OF SECTION 36(b) OF THE INVESTMENT COMPANY ACT
### (Against the Advisor and Columbia Distributor Defendants)

129. Plaintiff incorporates by reference all paragraphs above.

*33*

130.    The Columbia Acorn Trust, each of the Columbia Funds Trusts and Independent Columbia Stock Funds are registered investment companies.

131.    The Advisor Defendants are each investment advisors for the Columbia Funds as that term is defined in Section 2 of the ICA.

132.    The Columbia Distributor Defendants act as the principal underwriter for the Columbia Funds under Section 36(a) as defined in Section 2 of the ICA.

133.    Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), the investment advisor of a mutual fund owes to the mutual fund and its shareholders a fiduciary duty with respect to its receipt of compensation for services or payments of any material nature paid by the mutual fund or its shareholders to such investment advisor or any affiliated person. This duty applies not only to the terms of the advisory fee agreements, but also to the manner in which advisors seek approval of such agreements. Thus, among other things, Section 36(b) prohibits advisors from soliciting the approval of any advisory agreement from a fund board by use of false or misleading information, or by failing to disclose information material to the board's decision regarding their compensation. Information concerning conflicts of interest is particularly important to the funds and to their independent directors.

134.    Pursuant to Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35(b), mutual fund shareholder may bring a civil action against an investment advisor or any affiliated person who has breached his or its fiduciary duty concerning such compensation or other payments.

135.    As alleged above in this Complaint, each of the Advisor Defendants and the Columbia Distributor Defendants breached his/her or its fiduciary duty with respect to the receipt of compensation or other payments from the Columbia Funds or their shareholders.

*34*

136.    By virtue of the foregoing, the Advisor Defendants and the Columbia Distributor Defendants have violated Section 36(b) of the Investment Company Act, 15 U.S.C. § 80a-35.

137.    As a direct and proximate result of the wrongful conduct alleged above, the Funds and their shareholders were damaged, including by the diminution of assets and value (including the NAV) of the Columbia Funds and corporate waste, for which defendants are liable.

## COUNT III

### COMMON LAW BREACH OF FIDUCIARY DUTY
### (Against the Advisor Defendants, the Columbia Distributor Defendants and the Trustee Defendants)

138.    Plaintiff incorporates by reference all paragraphs above.

139.    The Advisor Defendants, the Columbia Distributor Defendants and the Trustee Defendants (the "Fiduciary Defendants") and each of them owed to the Columbia Funds and their shareholders the duty to exercise due care and diligence, honesty and loyalty in the management and administration of the affairs of each Columbia Fund and in the use and preservation of its property and assets, and owed the duty of full and candid disclosure of all material facts thereto.  Further, said defendants owed a duty to each of the Columbia Funds and their shareholders not to waste the funds' corporate assets and not to place their own personal self-interest above the best interest of the funds and their shareholders.

140.    To discharge those duties, the Fiduciary Defendants and each of them were required to exercise prudent supervision over the management, policies, practices, controls, and financial and corporate affairs of the Columbia Funds.

141.    As alleged in this Complaint, each of the Fiduciary Defendants breached his/her or its fiduciary duty by receiving excessive compensation or payments in connection with the timing schemes and other manipulative schemes as alleged in this Complaint.

142.    As alleged above, each of the Fiduciary Defendants also breached his or its

fiduciary duty to preserve and not to waste the assets of the Columbia Funds and each of them by

permitting or incurring excess charges and expenses to the Columbia Funds in connection with

the Timer Defendants' timing scheme.

143.    As a direct and proximate result of their wrongful conduct, the Columbia Funds

suffered damages in connection with the acts and practices alleged in this Complaint.

## COUNT IV

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against the Timer Defendants)

144.    Plaintiff incorporates by reference all paragraphs above.

145.    The Timer Defendants knew of the existence and extent of the fiduciary duty

between the Fiduciary Defendants and the Columbia Funds and their shareholders. The Timer

Defendants knew that their "timing" in the Columbia Funds were manipulative devices and knew

that these acts were a breach of the fiduciary duties owed to the Columbia Funds by the

Fiduciary Defendants. The Timer Defendants maliciously, without justification and through

unlawful means, aided and abetted and conspired with the Fiduciary Defendants in breaching

their fiduciary duties and provided substantial assistance and encouragement to the Fiduciary

Defendants in violating their fiduciary duties in the manner and by the actions described in this

Complaint.

146.    The Timer Defendants are jointly and severally liable with the Fiduciary

Defendants to the Columbia Funds for damages proximately caused by their aiding and abetting

as alleged herein.

147.    As a direct and proximate result of the Timer Defendants' wrongful conduct, the assets and value (including the NAV) of the Columbia Funds have been reduced and diminished and the corporate assets of the funds have been wasted.

## COUNT VI

### CIVIL CONSPIRACY
### (Against All Defendants)

148.    Plaintiff incorporates by reference all paragraphs above.

149.    The Defendants entered into an agreement or agreements or combinations with each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of an agreement and combination.

150.    The Defendants by their actions have manifested actual knowledge that a tortious or illegal act or acts was planned and their intention to aid in such act or acts.

151.    The Trustee Defendants' conduct constituted willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of his or her office.

152.    The Defendants maliciously and intentionally conspired, combined and agreed with one another to commit the unlawful acts alleged in this Complaint or to commit acts by unlawful means causing injury to Plaintiff and proximately causing injury and damages to the Plaintiff for which they are jointly and severally liable.

153.    The Columbia Funds have suffered damages as a result of the wrongs and the conspiracy to commit such wrongs as alleged in the Complaint in an amount to be proved at trial.

**WHEREFORE**, Plaintiff prays for judgment as follows:

A.    Removing each of the Trustees of the Columbia Funds named in this Complaint and replacing them with independent Trustees;

B.    Removing the Advisor Defendants and the Columbia Distributor Defendants;

C.     Rescinding the management and other contracts for the Columbia Funds with the Columbia Defendants;

D.     Awarding monetary damages against all of the Defendants, jointly and severally, in favor of the Columbia Funds, for all losses and damages suffered as a result of the wrongdoings alleged in this Complaint, including punitive damages where appropriate, together with interest thereon,

E.     Ordering Defendants to disgorge all profits earned on unlawful trading and all management and other fees earned during the period of such trading,

F.     Awarding Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for plaintiffs' attorneys, and experts,

G.     Granting Plaintiffs such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  Boston, Massachusetts
         May 14, 2004

**DEUTSCH WILLIAMS BROOKS
DERENSIS & HOLLAND, P.C.**

By:

Steven J. Brooks
Robert D. Hillman
99 Summer Street
Boston, MA 02110
(617) 951-2300
rhillman@dwboston.com

**WOLF HALDENSTEIN ADLER
   FREEMAN & HERZ LLP**
Daniel W. Krasner
Mark C. Rifkin
Demet Basar
Robert Abrams
Christopher S. Hinton
270 Madison Avenue
New York, NY 10016
(212) 545-4600

**CHITWOOD & HARLEY**
Martin D. Chitwood
Lauren D. Antonino
2300 Promenade II
1230 Peachtree Street, NE
Atlanta, GA 30309
Telephone: 404/873-3900

354686

## **VERIFICATION**

I, Harold C.L. Beardsley being competent to testify and based on personal knowledge, hereby verify that I have read the foregoing Columbia complaint against Defendants and that it is true and correct to the best of my knowledge, information, and belief.

Dated: March __19__, 2004

## **VERIFICATION**

I, _Steven Burda_ being competent to testify and based on personal knowledge, hereby verify that I have read the foregoing Columbia complaint against Defendants and that it is true and correct to the best of my knowledge, information, and belief.

Dated: March __18__, 2004

_Steven Burda_

_cell # 215-720-5205_

_Re: Columbia_